Bristol County Retirement versus Adient PLC. Would you make sure that I have Dick West's phone number so I can call him after. Good morning, counsel. Good morning, your honors. And may it please the court, my name is Guillaume Buell. I represent the Plaintiff Appellant Bristol County Retirement System. During the class period of this proposed securities class action, defendants materially misled investors regarding severe problems plaguing Adient's core metals division and its ability to launch new business. And I'd like to briefly start by pointing to one of the defendants' own disclosures approximately one year into the class period. Give me the date when you talk about this because I have some comments by date. Yes, your honor. That they made, go on. On January 17th of 2018, defendant Staffel admitted that Adient's manufacturing plants were not operating efficiently and that the core metals division was plagued by launch inefficiencies, quote, that was a quote, that occurred because Adient, quote, mistimed or certainly misestimated the ability to run at rate on these things. And as we were unable to run at rate, we were facing premium freight, close quote. He then goes on to say, quote, our issues can be summarized into a half dozen facilities mostly concentrated in North America, close quote. He's referring to Adient's manufacturing plants, your honors, in North America. This is precisely what the confidential witnesses say was happening at the very start of the class period. Several of the confidential witnesses point to issues in November of 2016 with Adient's plants in North America where one confidential witness confirms that the internal data showed that the plants were not executing efficiently. And then in January of 2017, you have confidential witness six informing the individual defendants that the metals division was not able to have stable launches because of their lack of resources and the launch problems that the company was facing. And on that very date, January 11th, 2017, the CEO speaking to an analyst investor conference said that metals is on an upward trajectory. Yes, your honor, he did say that at that time. And by that time, they couldn't meet their launches. Is that correct? That's correct. That's what the confidential witnesses say was the case within the company in late 2016 and in January of 2017, including a detailed panorama of facts from confidential witness six. And then several other of the former employees of the company provide corroborating details of the specific launch problems that were plaguing this company's metals division. So let's talk about an upward trajectory. That's not puffery, right? I mean, he's saying we're on an upward trajectory. It's not past, it's what they think they're doing at that time. Sounds a lot to me like synchronies. There's no pushback. I think that's exactly correct, your honor. And in fact, the context of that is very important. This circuit always reminds litigants to look at the context of statements. And in November of 2016, Mr. Staffel had told investors that the metals, that they were seeing a big improvement in metals. And what did he mean by that? He said, we have present tense, some mega launches going on in the metals business period, close quote. He says this on November 8th of 2016 at page 211 of the appendix. What he's telling investors in November of 2016 at the start of the class period is, we're going to fix metals by bringing in a lot of new business. And no one disputes that they did that. What they did not tell investors for a full year is that while the company had obtained significant new business, because of the resource cuts that the individual defendants had been driving for some time, the company didn't have the ability to manufacture all of the car parts that they had acquired new contracts to make. They spent a full year sitting on this information. And I think what's most probative of the falsity of defendant's statements, Your Honor, is when you connect what the confidential witnesses described at the start of the class period, on the one hand, with defendants' very own admissions in January of 2017, I'm sorry, in January of 2018, that corroborate precisely the exact same operating problems in the very same plants that the confidential witnesses, the manufacturing plants that the confidential witnesses are pointing to. Talk to me about Sienter. So in this case, Your Honor, the Sienter analysis is somewhat remarkable because on the one hand, the falsity of defendant's statement is because of the individual defendants' own doing. Mr. McDonald and Mr. Stafford, then the CEO and the CFO of the company, were the ones who were driving the company's resource cuts. They were the ones who refused to hire extra people for the launches. That's exactly right, Your Honor. And in fact, they refused to hire new people in business meetings at the close of fiscal year 17. They refused to hire how many people? Approximately, well, one of the confidential witnesses describes 100 people who had been specifically asked for. How many employees are there in this company altogether? It's in the tens of thousands, Your Honor. However, I would say that that is just one example of a request for resources that was refused by the individual defendants. The other confidential witnesses describe also in detail how quite generally, coming into the start of the class period, there had been so many cuts to the metals division that they simply did not have enough people to work all of the contract, to staff the plants and to manufacture all of the car parts that they had produced. That definitely sounds like mismanagement, which is not really actionable. I don't think labeling it as mismanagement is the case here. For one thing, the company pointed to a reduction of 500 people during the class period as being something that was going to materially impact margins. They do that at page 736 of the appendix, and the defendants even cited this in their brief. I think that the context of the 100 people that were requested at that specific meeting, that's just one example, Your Honor, that one of the confidential witnesses provided us where they tell us during our pre-complaint investigation here, these individual defendants, they had no desire to properly staff the company for its long-term growth. A company can be mismanaged in many different ways. And Your Honor, the problem is when the launch inefficiencies began to be disclosed to the market, it was a real problem for Adyan. The company's stock suffers significantly at each of the partial disclosures. And in fact, market analysts understand that the lack of resources is part of the problem. A Wells Fargo analyst on January 17th of 2018 at page 241 of the appendix, questions that, this is after the second partial disclosure, Your Honors, questions that the whole metals situation is head-scratching. And he asks, the company must not have enough engineers. So there's a direct link between the lack of resources and the fact that the company's not able to stably launch all of its new business. Why isn't, as Judge Jacobs suggests, just mismanagement instead of fraud? It's fraud because by telling investors that we have acquired, we've signed up all these new contracts to manufacture all of these new car parts, investors also assume at the same time that if everything's operating according to plan and executing this business is operating according to plan and on an upwards trajectory, that means that they must not only have won the contracts, but they're also in the process of making the car parts that they had agreed to make for car manufacturers. The reality is they were not. The confidential witnesses describe how in the start of 2017, the company was not able to make the parts. Doesn't it, when you say something's on upward trajectory, doesn't that mean that things are looking up? And isn't that really in the nature of opinion? It is, even if it's an opinion statement, Judge Jacobs. Mr. McDonald at the time omitted to also tell investors that yes, we're on an upwards trajectory, we have all this new business and we're working to execute it, but by failing to tell investors in January of 2017, but by the way, our resource cuts have hampered our ability to launch all these new contracts and we really might not be able to actually meet our customers' demands, that was a material omission. When it's disclosed a year later, the stock plummets. It's a material omission that something bad might happen in the future. The bad thing was happening at that moment in time. So, and I think this is very important because in January of 2017, what was already happening. Bad things are always looming. I mean. This wasn't looming though, this was already happening. What Confidential Witness Six describes in the monthly operational review meetings are data points showing that they do not have the ability to have stable launches, yet they keep approving new launches. And so, by January 2017, the exact same state of affairs at the company is already in place that the defendants belatedly disclose a full year later. They essentially sit on these launch inefficiencies for over a year and don't disclose them until November of 2017. And I see my time is up, Your Honor. Are you saying that when McDonald's says we're on an upward trajectory, it was not true? It was a material, it was a misleading half-truth, Your Honor. And I think the more probative statement is the one he makes on February 3rd of 2017, and then the April 28th and July 27th, 17 statements, where he says, Metals is operating according to plan. We're working to execute on the significant new launch inventory in the system. And what, and full stop. He doesn't disclose all of the launch inefficiencies that the company starts to disclose to the market beginning in November of 2017. Had they done so, the market would have reacted and understood that, yes, they have this new business, they're trying to execute it, but they're not executing it. And the fact that the defendants waited a full year to disclose it is what violates the securities laws, at least for the first half of the class period. And I see that my time's up. I've saved time for rebuttal. Yes, but you have reserved three minutes for rebuttal, I believe. Yes, Your Honor, thank you. Thank you, counsel. We'll hear from Adiant. Adiant. Thank you, Your Honors. May it please the court, Matthew Papora of Sullivan and Cromwell for the appellees. Your Honors, I was struck by the presentation we heard because it started off with what essentially is the theme of my argument today, which is that the problems that pervaded the metals business were disclosed by the company. There's actually a remarkable match. I think what we just heard primarily was that these disclosures were made too late, that these issues were ongoing for some time, but we failed to disclose them for a whole year. But that's just not accurate, Your Honor. And I think that if we actually look at the specific allegations from the confidential witnesses, we'll see that. Sorry, Your Honors. I'm getting, I'm new to reading glasses, so I've just added them. Welcome to the club. Thank you, Judge. A close reading of these allegations, particularly the ones that use dates, is imperative, right? The vast majority of the confidential witness allegations in the complaint are undated. And that's a real problem here, particularly when my friend across the aisle is making arguments that hinge on temporal aspects. So let's look at the ones that include dates. And let's examine two of the primary operational issues raised by the confidential witnesses and disclosed by Addyant, launch problems and cost overruns. So in 2015 and 2016, Addyant focused on booking new business in its metals division, which it successfully did. I think we just heard that. The new business was scheduled to begin to launch in mid to late 2017, increasing throughout the period. And that's from confidential witness number one. He makes clear that Addyant had limited launches by March 2017, with the majority starting in the second half of the calendar year of 2017. So when they say in January that they're on an upward trajectory, you're saying that was true. Well, Your Honor, certainly every time, let me put it this way. There is not a single factual allegation in the complaint that suggests that any of the statements made by the individual defendants were objectively false or that they, either of the individual defendants, did not believe in the opinions they were expressing. Not a single factual allegation. But getting back to this question of timing, Your Honor, as the new business began to launch, and again, we have to step back and remember, all of this related to Addyant's forward-looking statements, its projections that over a period of three to four years, it could achieve certain improvements to its margins and also certain improvements with respect to metals. Now, on appeal, the appellant has walked away from the statements with regard to the projected margin expansion, and this is only now about statements regarding alleged or projected improvements. And part of the plan here with respect to metals, and that too was forward-looking, these improvements were supposed to happen over a three to four-year period, right? Part of the plan was to get new business. That was vitally important, and Addyant did it. Again, we just heard that. That's admitted in the complaint and in the briefs. And as that new business began to launch in the second half of 2017, according to confidential witness number one, that's when Addyant started to struggle to meet the new demands and costs, or excuse me, concerns about cost overruns increased. When did Ford leave? I'm sorry, ma'am? When did Ford leave, because you couldn't meet their requirements? Losing the Ford business? Yes. Your Honor, I think that that happened sometime in 2017, but the point here, Your Honor- Was that the same time you were talking about an upward trajectory? Well, Your Honor, let's think about the disclosures that Addyant made to the market. On November 2nd, 2017, so November 2017, Addyant announces its 2017 fourth quarter results and disclosed that it experienced launch challenges in the quarter and that it expected to continue, those challenges expected to continue into the beginning of 2018. Now, if you look at paragraph 31 of the complaint, it's quite clear Addyant's fiscal year runs from October through September. And that means that this disclosure, that Addyant was experiencing launch challenges during the fourth quarter of 2017, meant that those challenges were occurring in July through September of 2017. That's exactly what the confidential witnesses say. They say that once this new business that Addyant achieved, which it told the market it was going to achieve, and then it told the market it did achieve it, once it launches the business, there were problems. This was a difficulty that the company was having in making launches happen according to plan. And the same is true with respect to the other operational issues alleged by the confidential witnesses. Addyant disclosed the impact of premium freight costs. That's in the record at 732 and 735. They disclosed labor inefficiencies. They disclosed elevated launch costs. Now, recognizing all of this, your honors, appellant then shifts to faulting Addyant for its inability to see that the improvements it put in place, which it disclosed to the market, that those improvements might not fix the problems. But those allegations are both classic fraud by hindsight, because they're made with the benefit of knowing they didn't work, and more importantly, they really do sound in mismanagement, as I think the questions from your honors have illustrated here. This argument that Addyant failed to hire 100 employees, the argument that that somehow rendered false, Addyant's statements that it was putting into place resources to address the metals issue, makes no sense, right? There's no- Well, it's at the same time they were saying that they were operating according to plan. Was it their plan to be understaffed and not meet their launches and lose the business of Ford Motor Car Company? Was that their plan? Well, no, Judge Buller, it wasn't, but their plan was multifaceted. Their plan, which was absolutely disclosed to the market, was to improve metals by a variety of means. Number one, they were going to secure new business. They did that. That was operating according to plan. Number two was to shut down unprofitable plants. They did that. That was according to plan. Number three was to increase business in China. They did that. That was according to plan. Yes, they had difficulties in launching the new business, but guess what? They told the market that. As soon as those challenges occurred in the summer of 2017, at the first reasonable time when they announced their financial results for that quarter, they made that disclosure. They said in July 2017 that they completed several restructuring projects, as you say, and execute on significant new launch inventory, but they weren't meeting that. They couldn't do the new launches. They didn't have enough employees. I don't think that the record bears that out, Your Honor. It absolutely is true that there were problems in metals, and they were disclosing that. They very clearly said in November of 2017, and then there were a remarkably detailed set of allegations in the very beginning of 2018, two times in January, and this is where I think my adversary began. The disclosures that were made on January 17th of 2018 are remarkably detailed about all of the different problems that were plaguing the company with respect to launching the new business. That's precisely what happened here, Your Honors, and let me just return back to the 100 employees piece of this, right? There is no allegation anywhere in the complaint that any of the individual defendants believed that this proposal from one confidential witness that we need to hire 100 new people, by the way, Judge Jacobs, in a company that has 85,000 employees, there's no suggestion that either of the individual defendants agreed with that proposal, let alone believe that- Was 85,000 in all of Adiant or just metals? 85,000. I'm only pointing to what's in the complaint, Your Honor, and it's 85,000 employees in Adiant. In Adiant? Correct. And metals was about 52% of Adiant? I don't know, with regard to head count, what the percentage is. I don't think that that information's in the record, Your Honor, but in any event, I think the point here, if we were to do the math, 100 out of, even if you take the presumption that it's half of the head count, it's not an incredibly large percentage. So then it wasn't lack of personnel, it was just mismanagement. I think that, at best, the complaint alleges mismanagement. There's, Adiant, sorry, there is no allegation that anyone believed that these hires would effectively save metals. And more importantly, Your Honor, Adiant did disclose to the market what it believed were the necessary resources to bring over to metals. And this was in January of 2018, it's at Appendix 774. Adiant identified that it was including a weekly metals steering committee meeting. It was moving more of Adiant's A team to the metals business. The appellant doesn't question that that happened. He doesn't allege that that was false. He just alleges that those were the wrong resources to add, Your Honor. And that is prototypically an argument about mismanagement. It's not at all about securities fraud. Your Honor, now if I could just very quickly move to, and look, there are obviously a number of different bases on which the district court dismissed. It's not only contemporaneous falsity. These certainly were forward-looking statements accompanied by cautionary language. These were opinion statements that are not actionable. Some of them were puffery indeed, as the district court found. But I think importantly, let's get to Sienter. There are no allegations that approximate a strong inference of Sienter here. There is a variety of different allegations that the appellant makes, and they don't come close, Your Honor. First of all, allegations of these issues being raised to the individual defendants is just a second shot at the failed allegations of contemporaneous falsity, number one. Number two, appellant cites undated allegations that management received reports detailing problems. Again, those reports actually match the disclosures that Adiant made to the market. When did Adiant start telling people that they had assets that needed to be written down? That was in 2018, Your Honor. It was after May 2018. I believe it was a few months after that. And when did the stock price drop 25%? Was that during the class period? That was at the tail end of the class period. That was after, by the way, Your Honor, in May, Adiant disclosed to the market that it wouldn't be able to achieve its guidance. And again, I think it's vitally important for this court to remember that this case primarily has always been about the statements, the forward-looking statements about Adiant achieving the 200 basis point margin expansion. It's only on appeal that now we're looking at metals. And all along, the statements about metals have been only one component of the margin expansion. Even before, in May of 2018, Adiant walked away from its guidance. Even earlier than that, in January of 2018, CEO McDonald, one of the individual defendants, made quite clear, he said, we're not walking away from our guidance that we might be able to get the 200 basis points, but we have to seriously question the composition of that because we're not sure metals can contribute because of all the problems that are plaguing that business. So he was quite clear with the market. What's the date of that statement? That was January 29th, 2018, Your Honor. Your Honor, I see that my time's expired, but if Your Honors have any further questions, I'm happy to take them. Thank you very much. Counsel, you reserve three minutes for rebuttal. Thank you, Your Honors. I'd like to briefly respond to the point about forward-looking statements. And I'm quickly to three of the first, three statements in the first year of the class period. We do see a big improvement in metals. We have some mega launches going on in the metals business now. November 8th of 2016, at page 211 of the appendix. That's not a forward-looking statement. February 3rd of 2017, this is a few weeks after CW6 tells the individual defendants, we're not able to have stable launches, guys. Our plants can't have stable launches. And what does Mr. Staffel tell the market? Metals is operating according to plan. And then on July 27th of 2017, another present-sense statement. At page 222 of the appendix, the metals business is continuing present-tense to execute. May I ask you, I hate to interrupt you, but Judge Pooler asked you, I believe, to address Sienta. And you either did, and I don't remember, or you moved on to other things. If you would. Yes, Your Honor. What's the basis for thinking that there's a Sienta in fraud? I'd like to point to the very case that my colleagues cited in their brief. Jones v. Peretz defended the CW's alleged facts that showed that the individual defendants had access to reports and information, with facts indicating a divergence from publicly disclosed information. That is this circuit's standard, repeated in many other different cases over the years. So they knew things that they weren't disclosing, and those things that they knew would have painted a different picture to the investing public. Yes, Your Honor, precisely so. Because when defendants started to, what defendants started to disclose in piecemeal fashion in November of 17 is exactly what the CW's describe happening a year earlier in the class period. Another important issue here, to the mismanagement point, Judge Jacobs, that I would like to briefly speak to is that CEO Henderson, after Mr. McDonald resigns from the company, he says on July 26th of 2018, this is the interim CEO, processes existed for quite some time, but they're not always followed. And in all the cases where we had flawed launches, we haven't followed the processes. That corroborates, in July of 2018, what the confidential witnesses are saying at the start of the class period. And quite frankly, for the individual defendants to have told the market, metals is operating according to plan, that's not true if they're not following their processes with none of these launches going according to plan. And so I hope I've answered your question about Sienta, Judge Jacobs, and your question about mismanagement. I think this is, given the stock drops at the end of the class period, this is much, much more than mismanagement. There was a $700 million write-down at the end of the class period of metals assets. That was in almost a billion dollars. That's massive. I'd like to very briefly say on Rule 60- That doesn't argue anything worse than mismanagement. I mean, mismanagement can be extremely costly. It's not mismanagement if it paints a materially misleading picture of the state of affairs of the company during the class period, which the 1934 Exchange Act does not allow companies to do. Issuers have to speak. When they choose to speak on a topic, they have to tell the whole truth. And it wasn't mismanagement to completely ignore for a full year what they belatedly disclose. And I'd like to very briefly, my time is up, may I have 30 seconds to address the 60B motion? You can just take a minute or two, go on. Thank you, Your Honor. On the Rule 60B motion, I would just like to say that the district court, and this court does not need to reach it, of course, if it reverses the decision to dismiss the complaint. But we'll say this much. Confidential Witness 8 is a, proposed Confidential Witness 8 is the former general managers of metals. It's no secret that that person is otherwise discussed throughout the complaint that's before the court on the merits. This is the CEO's right-hand man in the class period about metals. He's in the room. And what he told us, unfortunately, after the court dismissed the complaint, is that every single month during the class period, the problems were worse. Is what you're saying in the record? Yes, it is, Your Honor. It's at 2235 of the record. No, go ahead, you said it's after dismissal. And what Confidential Witness 8 says is, I was in the room every month with the two individual defendants, and they were provided information at each of those meetings, monthly and quarterly, demonstrating that what they were telling the market about metals operating according to plan was not accurate. And in fact, and I'll stop here because I'm almost at two minutes and I want to respect the court's time. Confidential Witness 8, in fact, looked at the complaint and said, by the way, those two statements, and this was not a lawyer, those may have been technically accurate, but they're very misleading because they omitted. And what he says corroborates everything that the other Confidential Witnesses say. And that is precisely what this circuit requires for a misleading half-truth to be actionable. Thank you very much, Your Honor, unless you have any further questions. Thank you both very much. Interesting case. We'll reserve decision.